**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re MICHELLE DAVIS-PETERS, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Case No. 24-09311 |
| | ) | |
| In re GORDON J. WOODS, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Case No. 24-14211 |
| | ) | |
| | ) | Judge Deborah L. Thorne |

**<u>MEMORANDUM OPINION</u>**

Gordon Woods and Michelle Davis-Peters are both chapter 13 debtors who have objected to the claims filed by their mortgage servicers for "projected escrow shortages."  Each claim that the escrow shortage claims are not prepetition claims and therefore should be disallowed.  The court must decide whether these projected escrow shortages, which were calculated postpetition, are properly pre- or postpetition claims.  Based on the plain language of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Official Forms, and relevant nonbankruptcy law, the court holds that projected escrow shortages are prepetition claims, even if a servicer undertakes the escrow analysis postpetition, and that the effective date of the escrow analysis is the petition date.  The objections to the claims will be overruled, except to the extent that Lakeview Loan Servicing, LLC, used the conversion rather than the petition date in its escrow analysis.

### I.    Background

A.  <u>How to Calculate Escrow Charges under the Real Estate Settlement Procedures Act</u>

The Bankruptcy Code (the "Code") defines a claim very broadly as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  § 101(5).[1]

Because claims are "rights to payments," their substance is based on the non-bankruptcy law that gives rise to a creditor's right to payment.  Here, because we are dealing with claims for escrow account shortages, that law is the Real Estate Settlement Procedures Act ("RESPA").[2]

An escrow account (also called an impound account) is "[a]n account of accumulated funds held by a lender for payment of taxes, insurance, or other periodic debts against real property." Account (impound account), Black's Law Dictionary (12th ed. 2024).  In some situations, the mortgage lender services the mortgage loan and its associated escrow account; in others, they are managed by a separate servicer, who is an agent of the lender.  RESPA and Reg. X apply equally to both, and for clarity, the court uses only the term "servicer" today.[3]  The Consumer Financial Protection Bureau, which regulates escrow accounts associated with federally related mortgage loans,[4] explains that escrow accounts help homeowners because they can send the money for big expenses, such as tax and insurance, to their servicers on a monthly basis instead of paying big lump sums.  The servicers then pay those expenses.  CFPB, What is an escrow or impound account?, https://www.consumerfinance.gov/ask-cfpb/.  Escrow accounts also protect servicers,

---

[1] All chapter, section and rule references, unless otherwise noted, are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Code"), and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037 (the "Rules").

[2] Rule 3001(c)(2), discussed in more detail below, requires creditors to support and explain their claims by attaching certain accounting statements and/or official forms.  The instructions for Official Form 410A, which is required for claims involving escrow accounts, expressly require creditors to calculate projected escrow shortages in the manner prescribed by the Real Estate Settlement Procedures Act.

[3] As defined in the Real Estate Settlement Procedures Act, a servicer is any person "receiving any scheduled payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan."  12 U.S.C. § 2605(i)(3).

[4] The court notes that the debtors have not alleged that Reg. X improperly implements or interprets RESPA. RESPA delegates authority to the Consumer Financial Protection Bureau to "prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of [RESPA]."  12 U.S.C. § 2617(a).  The Department of Housing and Urban Development was the first agency to promulgate Reg. X, the implementing rules which govern escrow account practices.  Following the subprime mortgage crisis in the first decade of the 2000s, the Dodd-Frank Act gave rulemaking authority under RESPA to the Consumer Financial Protection Bureau, which restated HUD's implementing regulation.  Pub. L. 111-203 (July 10, 2010); 12 C.F.R. 1024.

because they keep homeowners current on payments to tax authorities (which could take competing security interests in the property the servicer financed) and insurance companies (which could cancel policies that protect the servicer's collateral).

What servicers can require homeowners to pay into an escrow account—including how and when homeowners must pay these amounts to servicers, and how much a servicer is allowed to require a homeowner to pay into an escrow account—is governed by RESPA. RESPA became effective half a century ago and aimed to prevent abuses in the home mortgage industry, in part by reducing "the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance." 12 U.S.C. §§ 2601(a) and (b). By enacting RESPA, Congress aimed to address three problems: (1) real estate settlement practices that increased costs to homebuyers without conferring any benefits, including bloated escrow accounts; (2) informational asymmetries between consumers and lenders; and (3) inefficiencies in title recording systems. S. Rep. No. 93-866, at 6547 (1974). With regard to escrow accounts, RESPA aimed to stop servicers from exacting exorbitant charges "far in excess of the amounts actually necessary to pay tax and insurance premiums as they come due." Hearing on Overcharging on Mortgages: Escrow Account Limits Before the Subcomm. on Hous. and Comm. Dev. of the H. Comm. on Banking, Fin., and Urb. Affs., 102nd Cong. 63-64 (1991) (report by Melvin L. Goldberg, Assistant Att'y Gen. of New York).

In its current form, RESPA addresses escrow account abuses by requiring annual statements, limiting a computation period to one year, and capping the amount of cushion servicers can collect. 12 U.S.C. § 2609. It does so through Regulation X ("Reg. X"), which limits what servicers can collect as escrow and requires all servicers to use the same accounting method. Reg.

X has a very particular vocabulary. Although the bare definitions are a bit dry, it's worth laying them out clearly because it is these definitions that decide the issues in these cases:

- "Escrow account analysis": "the accounting that a servicer conducts in the form of a trial running balance for an escrow account." The analysis has three goals:

    (1) Determine the appropriate target balances;

    (2) Compute the borrower's monthly payments for the next escrow account computation year and any deposits needed to establish or maintain the account; and

    (3) Determine whether shortages, surpluses, or deficiencies exist.

    12 C.F.R. 1024.17(b).

- "Trial running balance": "the accounting process that derives the target balances over the course of an escrow account computation year." *Id.*

- "Disbursement": what the lender pays out of an escrow account on behalf of a homeowner. "If the servicer knows the charge for an escrow item in the next computation year, then the servicer shall use that amount in estimating disbursement amounts. If the charge is unknown to the servicer, the servicer may base the estimate on the preceding year's charge, or the preceding year's charge as modified by an amount not exceeding the most recent year's change in the national Consumer Price Index for all urban consumers." 12 C.F.R. 1024.17(c)(7).

- "Target balance": the estimated month-end balance "that is just sufficient to cover the remaining disbursements from the escrow account in the escrow account computation year," including a cushion. 12 C.F.R. 1024.17(b).

4

- "Cushion": an amount the servicer is allowed to collect, determined either by the mortgage loan documents or limited to an amount no greater than 1/6 of the estimated total annual payments from the account (two months' payments), whichever is lower. 12 C.F.R. 1024.17(c)(1)(ii), (c)(5).

- "Computation year": a 12-month period that is the basis for the servicer's estimations when it analyzes a homeowner's escrow account. These estimations include what the servicer expects to spend as well as what it expects it will need to charge a homeowner monthly to cover its expenses. 12 C.F.R. 1024.17(b).

- "Deficiency": the amount of negative balance in an escrow account at any given time. *Id.*

- "Shortage": occurs when a "current account balance falls short of the target balance *at the time of escrow* analysis." *Id.* (emphasis added).

RESPA allows servicers to collect money from homeowners that the servicers reasonably expect to spend for things like property tax and insurance, as well as a cushion of an extra two months' payments. So, in order to decide to charge homeowners in the coming year, servicers must take multiple steps: first, they have to look at what happened last year; second, they have to estimate how much last year's disbursements will increase in the coming year; third, they have to add up all of these estimated disbursements, resulting in the estimated total annual payments. The result of step three will be the total amount a servicer expects to pay out of the escrow account in the computation year. Finally, the servicer adds to this estimate its allowed "cushion," and then divides the final amount by twelve to determine a homeowner's monthly payments in the coming year.

Of course, it's a fiction to refer to these things as "steps." In reality, servicers do this analysis—this trial running balance—with software that employs particular mathematical

formulas.  The result of the analysis is an explanatory chart presented to the homeowner, which shows a "shortage" if payments based only on the servicer's estimated total annual payments turn out to be less than what the servicer is contractually entitled to as its "target balance." *See infra,* Fig. 1, Section II.A.  Crucially, the homeowner is liable for this shortage as soon as the analysis is complete—as soon as the servicer projects a shortage exists—but RESPA requires the servicer to allow the homeowner to "repay" it in "equal monthly payments over at least a 12-month period." 12 C.F.R. 17(f)(3)(ii)(B).  The servicer can also simply allow it to exist, or, if it is smaller than a single month's payment, the servicer can require the borrower to repay it within 30 days.  But in any case, the servicer has a right to payment for the shortage as soon as the analysis is done, and the homeowner has the right to split the payments into twelve monthly parts.

A servicer's "right to payment" for an escrow account shortage therefore arises at the time a servicer conducts the escrow analysis.  A shortage is a creature of escrow analysis, not payment history, and it is based on projections, not any actual missed payments.  Contrast this with a "deficiency," which arises when an escrow account balance actually drops below zero.  This RESPA definition of "shortage" goes against vernacular usage, and that is why the court has taken pains to present and explain the statutory and regulatory scheme.

B.  Facts of the Cases

Gordon Woods ("Woods") lives in a property he owns in Bolingbrook, Illinois.  He is also a co-signer on the mortgage of his daughter's home in Plainfield, Illinois.  Wells Fargo Home Mortgage ("Wells Fargo") financed both home purchases, and both mortgages give Wells Fargo the right to collect escrow account payments in accordance with RESPA.[5]  (Woods Dkt. No. 2).

---

[5] The Wells Fargo mortgage documents have the following language: "Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; . . . (c) premiums for any and all insurance required by Lender .

Woods filed a petition for bankruptcy under chapter 13 on September 25, 2024.  Wells Fargo filed proofs of claim that included projected escrow shortages of $34.18 for the Bolingbroke home and $1,737.49 for the Plainfield home.  The claims also showed that Woods had not missed any monthly mortgage payments in the months leading up to his bankruptcy.  As required by the Federal Rules of Bankruptcy Procedure (the "Rules"), Wells Fargo attached to each claim a copy of the escrow analysis it conducted when it learned Woods had filed a chapter 13 bankruptcy.  Based on these attachments, it appears that Wells Fargo undertook the escrow analyses on September 29 and 30, several days after the petition date.  (Woods Claims #1 and #2).

Michelle Davis-Peters lives in Minooka, Illinois.  On June 25, 2024, she filed a voluntary chapter 7 petition and scheduled several creditors with security interests in her property, including mortgagee Flagstar Bank.  (DP Dkt. No. 1).  The chapter 7 trustee discovered that there was equity in the property, so, to prevent her home from being sold, Davis-Peters moved to convert to chapter 13.  The court entered the order of conversion on September 26, just one day after Woods filed his case.  (DP Dkt. Nos. 11 and 17).  On behalf of Flagstar Bank, Lakeview Loan Servicing, LLC ("Lakeview") filed a proof of claim that included an escrow analysis dated October 3, which showed a project escrow shortage of $920.82.  (DP Claim #7).  The mortgage on which the claim was based contained language similar to the Wells Fargo mortgage documents.  (*Id.*, "Mortgage" p. 4 - 5 ¶ 3).  Like Wells Fargo, Lakeview did not assert that Davis-Peters had missed any monthly payments.

---

. . These items are called 'Escrow Items.'" (Woods Claim #1, "Mortgage" p. 4 ¶ 3; Claim 2, "Mortgage" p. 4 ¶ 3). "Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law."  (*Id.*, p. 5 ¶ 3).

C. Relevant Bankruptcy Law and Rules of Procedure

Outside of bankruptcy, a servicer will perform escrow analysis on an annual basis, at the end of the computation year from the previous analysis. Bankruptcy disrupts the timing of the analysis, but it doesn't fundamentally change it. Recall that in bankruptcy a claim is simply a right to payment. While the definition of a claim is broad, the procedure for filing one is straightforward. In an individual debtor's case, the Rules require creditors to attach certain documents:

> (A) an itemized statement of the principal amount and any interest, fees, expenses, or charges incurred before the petition was filed;
> (B) for any claimed security interest in the debtor's property, the amount necessary to cure any default as of the date the petition was filed;
> (C) for any claimed security interest in the debtor's principal residence:
>> (i) Form 410A; and
>> (ii) if there is an escrow account connected with the claim, an escrow-account statement, *prepared as of the date the petition was filed*, that is consistent in form with applicable nonbankruptcy law.

Rule 3001(c)(2) (emphasis added). Form 410A is an Official Form, promulgated by the U.S. Courts. The "relevant nonbankruptcy law" is RESPA, as the instructions to Official Form 410A explain. Both Form 410 (to be used for all proofs of claim) and 410A (to be attached pursuant to the above rule) require creditors to fill out the forms with "information about the claim as of the date the case was filed."[6] The official forms thus require escrow account servicers to perform escrow analysis with information available to them "as of the date the petition was filed," instead of performing the analysis at the end of the computation year. When the servicer conducts this analysis "as of" the petition date, the computation year will begin the month after the petition was filed.

This procedure is necessary because the Code distinguishes between pre- and postpetition claims. The value of prepetition claims is fixed as of the petition date, unless one of the Code's

---

[6] Both forms and their instructions are available in the federal judiciary's library of bankruptcy forms, at: https://www.uscourts.gov/forms-rules/forms/bankruptcy-forms.

exceptions applies. § 502(b). The automatic stay prevents servicers from collecting claims while the bankruptcy proceeding is pending, so a servicer can't require the homeowner to pay an escrow shortage in twelve equal payments during the computation year, as it normally would. § 362(a)(6). Instead, in chapter 13, debtors cure prepetition defaults over the life of their plans, and they must pay postpetition claims as they come due, based on the claims' underlying contract terms. § 1322(b)(5). Put differently, chapter 13 debtors have the right to distribute prepetition defaults over three to five years of monthly installment payments, while they are on the hook for current payments on the mortgage. This ability to "cure and maintain" is what attracts many debtors to chapter 13 in the first place.

## II.   Discussion[7]

Mortgages and time's ever-forward march interact in complex ways in chapter 13, so much so that at least one court in this circuit has resorted to explaining them with principles from quantum physics. *Hegeduis v. Harris, N.A. (In re Hegeduis)*, 525 B.R. 75 (Bankr. N.D. Ind. 2015) (applying Einstein's theory of special relativity and the Heisenberg uncertainty principle to determine the proper date of valuing a chapter 13 debtor's home). But in this case, because the statutory and regulatory language is unambiguous, we need resort only to the Code and the Rules, as well as the relevant nonbankruptcy law. There is also no dispute here that the creditors will at some point have a claim for their payments of taxes and insurance on homeowners' behalf. The question is when the creditors' right to payment accrues.

The burden of proof for a claim objection lies clearly with the objecting party, because a proof of claim is presumptively valid. § 502(a); Rule 3001(f). Bankruptcy courts consistently

---

[7] An objection to a claim is a core proceeding under 28 U.S.C. § 157(b)(2)(B). The court has subject matter jurisdiction pursuant to § 1334 and the District's internal operating procedure, which refers such matters to bankruptcy courts. IOP § 15(a). Venue is proper under 28 U.S.C. § 1409(a).

9

hold that the burden is on a debtor to produce evidence that a proof of claim is factually deficient. *See e.g. In re Chew*, 627 B.R. 112, 113 (Bankr. E.D. Penn. 2021). In this case, the servicers have made prima facie cases by attaching the required documentation to their claims. The burden is therefore on Woods and Davis-Peters to refute or negate at least one of the allegations in the challenged claims.

Woods and Davis-Peters have the same counsel, and in nearly identical pleadings, they argue that the claims for projected escrow shortages are based on predictions and necessarily will not accrue until after the petition date—so they cannot be prepetition claims. Projected escrow shortages, on this view, are nothing but "phantom arrearages," and the debtors' memoranda of law argue that a servicer does not have the right to recover any escrow shortage until the servicer actually makes a tax or insurance payment on behalf of a homeowner. (Woods Dkt. No. 25, p. 6; DP Dkt. No. 37, p. 6). Woods and Davis-Peters also argue that, because the servicer performed its escrow analysis *after* they had filed their petitions, the projected escrow shortages are postpetition claims. (Woods Dkt. No. 44, p. 2; DP Dkt. No. 50, p. 3). Finally, Davis-Peters also objects to Lakeview adding a cushion to its escrow analysis, arguing it was solely based on "the lender's preferred two-month cushion" rather than what "Lakeview projects to spend over and above what it projects to receive."[8] (DP Dkt. No. 37, p. 5).

Woods and Gordon-Peters have failed to refute or negate their mortgage servicers' claims. As the court will explain, RESPA and bankruptcy procedures require courts to treat these escrow shortages as prepetition claims. And nothing in the Code suggests that "as of the petition date" precludes performing escrow analysis after the petition has been filed, or that conversion of a case from chapter 7 to chapter 13 alters the effective date of the escrow analysis.

---

[8] There is a mention of Wells Fargo here, but the court assumes that was a scrivener's error.

A.  RESPA and bankruptcy procedures require courts to treat these as prepetition claims.

The Code and Rules make it clear that definitions from Reg. X, not the debtors' homespun explanations, govern these claims.  The debtors say that "actual escrow shortages" or "negative escrow" are "the amount[s] by which the lender has paid more than it collected in the last year." (DP Dkt. No. 37, p. 2).  As we know from the definitions above, what the debtors are actually describing is a "deficiency" in Reg. X terms, which occurs when an escrow account drops below zero.  12 C.F.R. 1024.17(b).  There is no "actual" or "negative" escrow shortage defined in Reg. X.  Still, the debtors argue, a "'projected escrow shortage' is an estimate, based on the lender's best guess at what taxes and insurance will be in the coming year."  (DP Dkt. No. 37, p. 2).  The projected escrow shortage, under this definition, cannot have created a right to payment prepetition because the money will not actually be spent until after the bankruptcy filing.

But under Reg. X, a shortage is *always* based on projections.  A shortage occurs when a "current account balance falls short of the target balance *at the time of escrow* analysis."  12 C.F.R. 1024.17(b) (emphasis added).  Both the Rules and the relevant official form require creditors filing proofs of claims for mortgages to adopt RESPA's definitions and computation methods.  Rule 3001(c)(2); "Instructions," Official Form 410A (defining a "projected escrow shortage" as "the amount the claimant asserts should exist in the escrow account as of the petition date, less the amount actually held"). The form's instructions also address "cushions" and define them in accordance with RESPA and Reg. X, stating that the projected escrow shortage should include them.  *Id.*  The contractual documents underlying and attached to the claims—agreed to by both parties—also reference RESPA and establish that their servicers had a right to estimate disbursements, to collect a cushion, and to follow RESPA procedures to require payment for any

11

shortage as soon as it was calculated.  The Rule thus expressly allows both estimates and cushions, putting that part of Davis-Peters' argument to rest.

The table below is excerpted from one of Wells Fargo's claims and shows how the servicer applied these definitions.  (Woods Claim #2).  The bank conducted its analysis in September of 2024, so the computation year began in October 2024 and ended in September 2025. Wells Fargo determined that, in the next twelve months, the escrow account would have to disburse funds to the Will County Tax Collector and to Allstate Insurance.  *Fig. 1*.

### Part 4 - Escrow account projections

**Escrow account projections from October 2024 to September 2025**

| Date | Payments to escrow | What we expect to pay out | Description | Projected escrow balance | Balance required in the account |
|---|---|---|---|---|---|
| Sep 2024 | | | Starting balance | $52.96 | $1,790.45 |
| Oct 2024 | $895.27 | $0.00 | | $948.23 | $2,685.72 |
| Nov 2024 | $895.27 | $0.00 | | $1,843.50 | $3,580.99 |
| Dec 2024 | $895.27 | $0.00 | | $2,738.77 | $4,476.26 |
| Jan 2025 | $895.27 | $0.00 | | $3,634.04 | $5,371.53 |
| Feb 2025 | $895.27 | $0.00 | | $4,529.31 | $6,266.80 |
| Mar 2025 | $895.27 | $0.00 | | $5,424.58 | $7,162.07 |
| Apr 2025 | $895.27 | $0.00 | | $6,319.85 | $8,057.34 |
| May 2025 | $895.27 | $4,157.14 | WILL COUNTY TAX COLLECTO | $3,057.98 | $4,795.47 |
| Jun 2025 | $895.27 | $0.00 | | $3,953.25 | $5,690.74 |
| Jul 2025 | $895.27 | $0.00 | | $4,848.52 | $6,586.01 |
| Aug 2025 | $895.27 | $4,157.14 | WILL COUNTY TAX COLLECTO | $1,586.65 | $3,324.14 |
| Sep 2025 | $895.27 | $2,428.88 | ALLSTATE INSURANCE | $53.04 | $1,790.53 |
| Totals | $10,743.24 | $10,743.16 | | | |

*Figure 1 Wells Fargo Home Mortgage's "Escrow account projections," attached to claim #2.*

Based on this table, the monthly payments will not result in a balance below zero dollars.  But these projected disbursements would bring the account below the minimum contractual balance— so the shortage is $1,737.49, or difference between the balance required in the account ($1,790.53) and the projected escrow balance ($53.04).  In Reg. X terms, there is a "shortage," even though there is not a "deficiency," because more money should be in the account.  Normally, RESPA requires the bank to collect this default over the entire twelve-month computation year.  But the servicer would still have a right to payment as soon as this chart came into existence.

12

When one considers the actual definitions in Reg. X, ambiguity disappears.[9]   By the regulation's plain language, a shortage exists whether or not a deficiency exists, and even more important for our purposes, the servicer's right to payment comes into being as soon as the servicer conducts the escrow analysis.   Reg. X. states clearly that when a servicer projects a shortage, it may immediately address the shortage, in one of three ways: by doing nothing, by requiring the homeowner to pay it within 30 days (if it is smaller than one monthly payment), or by splitting the entire shortage over the twelve monthly payments in the computation year.   12 C.F.R. 17(f)(3)(ii)(B).   This right to take action clearly establishes that the right to payment for the shortage accrued as soon as it was calculated. *JPMorgan Chase Bank, Nat'l Assoc., v. DeGuiseppi*, No. 1:18-cv-1457, *3, 2019 U.S. Dist. LEXIS 66125 (C.D. Ill. Apr. 18, 2019).   The Third and Fifth Circuits have both held, consistent with the foregoing analysis, that servicers' rights to payments for escrow shortages are based on RESPA and contract terms, and that such rights may exist as soon as a servicer projects a shortage.  *In re Rodriguez*, 629 F.3d 136, 142 (3rd Cir. 2010); *Campbell v. Countrywide Home Loans, Inc. (In re Campbell)*, 545 F.3d 348 (5th Cir. 2008).   In short: a borrower with an escrow account is essentially always in arrears for an escrow shortage.

Outside of bankruptcy, a homeowner would be able to split any shortage the servicer has calculated into twelve monthly payments, to be paid over the year that follows the analysis. Bankruptcy prevents the servicer from collecting the payments on this schedule.  Instead, the Rules reset the effective date of the escrow analysis, so that servicers undertake it once they learn of the bankruptcy rather than at the end of the computation year.  Rule 3001(c)(2) (requiring creditors to submit "an escrow-account statement, prepared as of the date the petition was filed").   The

---

[9] It is not for bankruptcy practitioners to sniff at the jargon of another legal field; we have plenty of our own. *See* Richard I. Aaron, *Hooray for Gibberish! A Glossary of Bankruptcy Slang for the Occasional Practitioner or Bewildered Judge*, 3 DePaul Bus. & Com. L.J. 141 (2005); Debra L. Schneider, *Bankruptcy Jargon Deciphered: A Short Guide to Bankruptcy Terminology,* 66 DEP'T OF JUST. J. FED. L. & PRAC. 97 (March 2018).

automatic stay and section 1322 prevent a servicer from collecting the shortage postpetition, during the twelve months following the computation, so the shortage is treated as a prepetition default. *In re Garcia,* 603 B.R. 640, 646 (Bankr. E.D. Cal. 2019) (scolding a servicer for "treat[ing]the prepetition defaults as a postpetition default to be cured within one year rather than as part of the prepetition arrearage cured as permitted by the Bankruptcy Code"). The court will explain below why the shortage is a prepetition claim, even if the escrow analysis occurs, in literal terms, postpetition. Suffice to say here that—as the numerous courts cited here have held—the debtor has the right to cure the default over a three- to five-year period, pursuant to section 1322(b)(5), rather than curing the default in twelve equal installments as RESPA and the mortgage documents require.

B. "As of the petition date" does not mean prepetition.

Recall that the relevant Rule requires a creditor to attach to a proof of claim "an escrow-account statement, prepared as of the date the petition was filed." Rule 3001(c)(2). Using similar language, the Code fixes the value of a claim filed in a bankruptcy case "as of the date of the filing of the petition." § 502(b). This wording leads Woods and Davis-Peters to argue that Wells Fargo erred by performing its escrow analysis after the debtors had filed their petitions:

> If Wells [Fargo] had computed a projected escrow shortage prepetition, it could be entitled to collect that shortage in its proof of claim. However, because it did not, and it only computed the projected escrow shortage postpetition, the projected escrow shortage only arose when the proof of claim was prepared, and was first due on October 1, 2024.

(Woods Dkt. No. 44, p. 2; *see also* DP Dkt. No. 50, p. 3). If this argument had merit, the consequences for debtors and servicers alike would be enormous: in any bankruptcy case servicers' rights to payment for escrow shortages would accrue *postpetition* and be therefore postpetition claims. Debtors would not have the right to cure these escrow shortages as prepetition claims.

14

But the consequences wouldn't stop there.  Such a reading would unsettle core bankruptcy practices with regard to property of the estate, exemptions, and involuntary bankruptcy.  *See, e.g., City of Chicago v. Fulton*, 592 U.S. 154, 156 (2021) ("[A] petition 'creates an estate' that, with some exceptions, comprises 'all legal or equitable interests of the debtor in property *as of* the commencement of the case.' §541(a)(1).") (emphasis added); *White v. Stump,* 266 U.S. 310, 313 (1924) ("When the law speaks of property which is exempt and of rights to exemptions it of course refers to some point of time. In our opinion this point of time is the one *as of* which the general estate passes out of the bankrupt's control, and with respect to which the status and rights of the bankrupt, the creditors and the trustee in other particulars are fixed.") (emphasis added); and involuntary petitions, *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985) ("The 'generally not paying' test is to be applied *as of* the date of filing of the involuntary petition.") (emphasis added).  There are surely other examples; the court will not (and likely could not) exhaust them all.

In bankruptcy, "as of the date" does not mean "on or before the date."  The Code does not define "as of."  But the Code and the courts cited above use the prepositional phrase in a manner consistent with its plain meaning, which, as Merriam-Webster explains, "indicate[s] a time or date at which something begins or ends."   "As of," Merriam-Webster Dictionary, https://unabridged.merriam-webster.com/unabridged/as%20of. The Oxford English Dictionary, similarly, though not exactly, notes that it signals "as things stood on (a date)."  "As of," Oxford English Dictionary, www.oed.com/dictionary/as_adv?tab=meaning_and_use#194115999.  In the context of Rule 3001, the phrase "as of the date the petition was filed" instructs a bank to undertake an escrow analysis *as if it currently were* the petition date *or as things stood* on the date the petition was filed.

When applied to escrow account analysis, then, the phrase "as of" the filing of the petition does not mean the analysis itself must have been performed on or before the petition date. "As of" is not a limitation on when the analysis must actually have been performed, but rather a limitation on the data set for the analysis. As an influential treatise notes:

> The actual preparation and filing of a proof of claim in a Chapter 13 case may take place weeks or months after the filing of the petition. Creditors must adjust what otherwise appears on internal records to determine the amount of debt at the petition date.

Keith M. Lundin, LUNDIN ON CHAPTER 13, § 131.1, at ¶ 32, LundinOnChapter13.com. The plain meaning of "as of" is supported by the fact that just two lines above the provision at issue, Congress demonstrated that it knows the difference between "as of" and "before" the petition date, and it chose not to require servicers to conduct an escrow analysis *before* the petition date. Rule 3001(c)(2)(A) ("an itemized statement of the principal amount and any interest, fees, expenses, or other charges incurred *before the petition was filed*") (emphasis added).[10] And such a reading accords with common sense. It should go without saying that filing a claim, especially in accordance with the relevant Bankruptcy Rule, is not a violation of the automatic stay. *In re Rodriguez,* 629 F.3d at 142 (2010) (*citing Campbell,* 545 F.3d at 355 (2008)). A servicer cannot be expected to perform an escrow analysis on or before the very date a debtor files a bankruptcy petition, when it's very likely the servicer or bank does not know that the debtor has filed bankruptcy. A servicer is even less likely to be able to predict a debtor is *about* to file—recall that in this case, the debtors were current on their mortgages as of the petition date. Therefore, the

---

[10] The most recent amendment occurred just months ago in 2024, when Congress amended the language of this Rule "as part of the general restyling of the Bankruptcy Rules to make them more easily understood and to make style and terminology consistent through the rules." Rule 3001(c)(2)(A) advisory committee's note to 2024 amendments.

Code and Rules require only that a servicer conduct an escrow analysis based on facts in existence "as of" the petition date.

The necessary result is this: The escrow analysis is done "as of" the petition date, so it is as if the servicer's right to collect the projected escrow shortage existed prepetition. *In re Chew*, 627 B.R. 112, 119-121 (Bankr. E.D. Penn. 2021). It is perhaps possible to come up with a hypothetical situation in which a servicer acts so slowly that it is incapable of recreating conditions as they were on the petition date. (Indeed, the Davis-Peters case, discussed below, may raise this concern.) In such a case, the creditor may not be able to recreate its dataset and attach documents to make a prima facie case that it is entitled to the projected escrow shortage as part of its claim.

Here, though, it appears that the servicer performed the required escrow analysis just four to five days after the debtor filed for bankruptcy, on September 29 and 30. (Woods Claim #1 and #2). Figure 1, examined in the previous section, shows that the data set was limited as the Code and the Rules require. Wells Fargo has done what it is entitled to do and certainly has engaged in no sanctionable conduct by conducting this analysis four days after Woods filed his petition. This analysis showed there was a shortage "as of" the petition date, and the bank's right to payment for that shortage therefore accrued prepetition. But the same is not true of the servicer in the Davis-Peters case, as explained below.

    C.  <u>In a converted case, the lender's right to the projected escrow shortage accrues as of the original chapter 7 petition date, not the date of conversion.</u>

The Davis-Peters case has one more wrinkle, which, curiously, neither party seems to have noticed. Recall that Davis-Peters initially filed a chapter 7 case, then converted to a case under chapter 13. The creditor asserted, and the debtor did not rebut, that the effective date for the escrow analysis is the date of conversion. In its response to the debtor's claim objection, Lakeview—

17

without explanation—simply conflated the two dates: "Pursuant to RESPA, and as required by the 410(A) official instructions, the projected escrow shortage is the amount that should exist in the escrow account *as of the petition date*, less the amount actually held.  The amount that should exist in the escrow account *at the time the case was converted* to Chapter 13 . . . "  (DP Dkt. No. 42, ¶ 11 (emphasis added)).  And in the next paragraph, Lakeview stated: "Applying the RESPA formula and following the 410A official instructions, Creditor correctly calculated the projected escrow shortage that was due *at the time the case was converted*."  (*Id.* at ¶ 11 (emphasis added)).

In fact, based on the language of the forms and the Code, the correct effective date would have been the petition date.  The official instructions on Forms 410 and 410A direct creditors to "[f]ill in information about the claim as of the date the case was filed."  Official Form 410; *see also* Official Form 410(A) ("If an escrow account has been established in connection with the claim, Rule 3001(c)(2)(C) also requires an escrow statement to be filed with the proof of claim. The statement must be prepared as of the date of the petition . . . ").  This is consistent with the two provisions of the Code that address claims in converted cases: sections 502 and 348.  We have already discussed section 502: it applies in all bankruptcy cases, no matter what chapter, and it fixes the value of claims as of the date the petitions were filed.  § 502(b).

Section 348 squarely addresses the effect of conversion on portions of the Code that are keyed to particular dates.  Except in limited circumstances enumerated in the statute, conversion of a case "does not effect a change in the date of the filing of the petition, the commencement of the case, or the order of relief."  § 348(a).  Thus, the general rule is that conversion does not alter the plain language of sections of the Code that mention "the date of the filing of the petition." None of the exceptions enumerated apply to the prepetition escrow account shortages discussed here.  § 348(b) and (c).  Therefore, when the Code, the Rules, and the official forms say a version

18

of "the date of the filing of the petition," they really mean "the date of the filing of the petition." Using the date of conversion for the effective date of escrow analysis improperly begins the computation year several months into the bankruptcy case.

To the extent Lakeview has miscalculated its claim, the court gives Lakeview leave to amend its claim consistent with this opinion.

**Conclusion**

For the reasons explained above, any request for sanctions is denied. Debtors' objections are overruled, except to the extent that Lakeview used the wrong effective date for its escrow analysis. Lakeview may amend its claim in a manner consistent with this opinion by May 15, 2025.

ENTER:

Date: April 15, 2025

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge